Fromm Laboratories, Inc. v. Commissioner.
Fromm Laboratories, Inc. v. Commissioner
Docket Nos. 57348, 60572, 60594,
United States Tax Court
T.C. Memo 1960-202; 1960 Tax Ct. Memo LEXIS 88; 19 T.C.M. (CCH) 1059; T.C.M. (RIA) 60202; September 29, 1960
*88 1. Held, that petitioner is not entitled to include among its amortizable assets, an item designated as "research and development costs," which actually represented the amounts that four interrelated corporate stockholders of petitioner had expended in meeting current operating expenses of carrying on their own businesses. Deductions claimed for amortization of such alleged asset are denied. 2. Held, that petitioner is not entitled, in computing its excess profits tax liabilities for the years 1951, 1952 and 1954, to include in its equity invested capital, alleged paid-in surplus which represented the same asset mentioned above, and which had never been contributed to it by its said stockholders. 3. Held, that petitioner, in computing its cost of goods sold for the year 1951, was not entitled to use an opening inventory of biological products, where it had at no time previously used such an inventory; had not requested or received permission to change its method of accounting or to use such an inventory; and did not present any book record which tended to establish, either the quanity of any such products on hand at the beginning of the year, or the cost or market value thereof, *89 or the time when it produced or otherwise acquired the same. Richard P. Tinkham, Esq., and Charles F. Smith, Esq., for the petitioner. John L. Pedrick, Esq., and Rex A. Guest, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in the income taxes of the petitioner corporation, as follows: Taxable year
Docket No.
ended
Deficiency
57348
5/31/51
$24,223.98
5/31/52
11,070.11
60572
5/31/53
13,284.79
60594
5/31/54
48,096.46 The cases were consolidated for trial. The issues for decision are: 1. Whether petitioner is entitled to the following claimed deductions for amortization or depreciation of intangibles, in addition to the other claimed deductions for amortization or depreciation of "patents" which the *90 respondent allowed: (a) A deduction of $55,120.90 for each of the taxable years here involved, representing amortization of an alleged "cost" (in cash) of $771,765.17, for research and development of petitioner's patents and processes. (b) Additional deductions, of $71,899.24 for the year 1951 and $106,837.08 for each of the years 1952 through 1954, for amortization of further "costs" (in property and services) of $1,107,701.10, for research and development in respect of the same patents and processes mentioned in Issue 1(a). Involved in both subdivisions of this issue are certain subsidiary questions, such as: Whether said "costs" were incurred by petitioner itself; whether they represented capital expenditures, as distinguished from current operating expenses of the party or parties by whom they were incurred; and whether the amounts of such "costs" were "contributed" to petitioner by certain of its stockholders, in cash, property and services, and as "paid-in surplus," as petitioner contends. 2. Whether petitioner is entitled, in computing its excess profits credit for each of the taxable years ended in 1951, 1952 and 1954, to include in its equity invested capital, "paid-in *91 surplus" of $771,765.17 represented by the same items that are claimed as "costs" under Issue 1(a). 3. Whether petitioner is entitled, in computing its cost of goods sold for the taxable year ended May 31, 1951, to use an opening inventory of $9,208.52 for biological products. All other issues raised by the petitioner in its pleadings were abandoned. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits identified therein and attached thereto, is incorporated herein by reference. Petitioner is a corporation which was organized in 1933 under the laws of the State of Wisconsin. Since the year 1954, it has owned and operated a laboratory at Grafton, Wisconsin, where it provides diagnostic services for the operators of "fur farms" and others, relative to the diseases of silver foxes, minks and other fur-bearing animals that are raised commercially; and where it also produces and sells serums, vaccines and other medicines for the treatment of animal diseases. It filed its Federal income tax return for each of the taxable years involved, with the collector or director of internal revenue for the district of Wisconsin. At all *92 times material, it maintained its books of account and filed its income tax returns on the basis of fiscal years ended May 31, and in accordance with an accrual method of accounting. Facts re the Fromm Fur Corporations Since at least the early 1900's, "fur farming," consisting of the raising of fur-bearing animals for the purpose of selling their pelts, has been an important industry in the State of Wisconsin. Among the poineers and leaders in this field were four brothers named Edward, Walter, John and Henry Fromm. Prior to 1929, these brothers carried on their fur-producing activities, in part through a partnership or joint venture operated entirely by themselves, and in part through another partnership or joint venture operated by them and Edwin J. Nieman. In 1929, the businesses of these two partnerships or joint ventures were separately incorporated, by the formation of two Wisconsin corporations named Fromm Bros. Inc., and Fromm Bros. Nieman & Co. As to the first of these corporations, all its outstanding shares of capital stock were owned at all times material by the four Fromm brothers, in equal portions. The Fromm-Nieman corporation, on the other hand, had outstanding *93 at all times 1,200 shares of capital stock, which were held as follows: 596 shares by said Fromm Bros. Inc.; 4 shares by the four Fromm brothers, in equal portions; 599 shares by said Edwin J. Nieman; and 1 share by Nieman's wife. Also, at all times since at least July 1933, Fromm Bros. Inc. has held a controlling interest in two other corporations engaged in the business of raising fur-bearing animals, which were named, Federal Silver Fox Farms, Inc., and Fromm Bros. Silvercross Fox Farm, Inc. The first of these had 2,000 shares of capital stock outstanding, which were held: 1,944 shares by Fromm Bros. Inc.; 5 shares by the four Fromm brothers and their wives; 16 shares by the Fromm-Nieman corporation; 34 shares by Walter J. Gruett, the comptroller of Fromm-Nieman; and 1 share by Edwin J. Nieman and his wife. The second of these lastnamed corporations, on the other hand, had 1,000 shares of capital stock outstanding, of which Fromm Bros. Inc. held 620 shares until 1947, and 996 shares thereafter; the four Fromm brothers and their wives held 4 shares; and Nieman and his associates held the remaining shares from 1934 until 1947 when the same were reissued to Fromm Bros. Inc. Edward *94 Fromm was at all times the president of all four of these corporations; and one or more of his brothers also was a principal officer of each. Until about 1938, most of the fur-bearing animals raised by these four corporations (hereinafter collectively called the "Fromm fur corporations") were silver foxes. But thereafter minks also were raised; and in more recent years, the sale of mink pelts has been their principal activity. These Fromm fur corporations have for many years ranked among the largest commercial fur growers in the world. They annually produce thousands of animals; and in some years, their sales of pelts have run into millions of dollars. Many, if not most, of the principal activities of the four Fromm fur corporations were conducted cooperatively or as a joint undertaking. Their activities pertaining to the raising of silver foxes [1] may summarily be described as follows. Fromm Bros. Inc. had a tract of about 16,000 acres located near Hamburg, Wisconsin, of which about 1,200 acres were devoted to "furring ranges" (hereinafter described). The other three Fromm fur corporations separately owned smaller tracts, consisting of approximately 600 acres, 200 acres and 500 *95 acres - all of which were located near Thiensville, Wisconsin. These latter tracts were used principally for the breeding of fur-bearing animals, and none of the same was devoted to furring ranges. After silver fox pups were born in the breeding pens of the several corporations (which usually was in the late winter or early spring), these pups were allowed to remain with their parents until early in the following fall; and then the pups were taken to the "furring ranges." These furring ranges, of which there appear to have been approximately 15, were all located on the premises of Fromm Bros. Inc.; and each consisted of about 80 acres of fenced-in woodland, where the fox pups were allowed to roam under conditions approximating their natural habitat. Each pup had markings on his ear, which identified the particular corporation to which he belonged. All expenses of operating the furring ranges and of maintaining the animals thereon, were borne initially by Fromm Bros. Inc.; and thereafter such expenses were allocated periodically among all four of said corporations, on the basis of the number of foxes which each placed on the ranges. The amount so allocated to each particular corporation *96 was then taken into its accounts as part of its operating expenses, and was deducted on its income tax return as a current operating expense of the year involved. In late November or early December of each year, after the silver fox pups had developed their fur while running on the furring ranges, they were trapped, killed, and pelted; and thereafter the pelts were treated and sold. All of these so-called pelting and marketing activities were handled by Fromm Bros. Inc.; and initially, it also paid all expenses of such activities and received all proceeds from sales of the pelts. Thereafter, such expenses and proceeds likewise were allocated among all four of the Fromm fur corporations - by crediting each with the proceeds from the sales of pelts of its foxes, and by charging each with its share of the pelting and marketing expenses. Each corporation then took into its books of account, the amounts of income and expense so allocated to it; and each reflected the same on its income tax return for the particular year involved. *97 Another activity which the four Fromm fur corporations handled cooperatively or as a joint undertaking, was the preparation and processing of the cereal portion of the food rations for their foxes. This processing was done at the Fromm-Nieman ranch at Thiensville; and the cereal was then distributed to the ranches of the several corporations, in accordance with their needs. Each corporation was charged with its portion of the total costs and expenses of such activity, based on the amount of cereal which it had received; and each then included such charges among its operating expenses, on its books of account and in its income tax returns. Facts re Disease Problem at Fromm Fox Ranches and Initial Disease Control Work of R. G. Green In the winter of 1921, which was prior to the incorporation of any of the above-mentioned corporations, the Fromm brothers began to experience deaths in their silver fox herds, which they attributed to the incidence of disease. This situation continued also in subsequent years. The Fromms were unable to identify the particular type of the suspected disease; and they could find no medical preparation which would meet their problem. Subsequently in *98 the summer of 1924, Robert Gladding Green, M.D., who was a member of the faculty of the University of Minnesota in its department of bacteriology and immunology, visited the Fromm brothers' fur ranch at Hamburg. He told the Fromms that he had learned of their disease problem; that he was interested in the subject of animal diseases; and that he would like to undertake a study of the fox disease which was confronting them. The Fromm brothers thereupon arranged with Green to undertake diagnosis and study of the suspected disease, and to attempt to find a method for controlling it. Green undertook this work without any formal agreement being entered into, except that the Fromms would from time to time supply him both with live foxes and with carcasses of deceased foxes for use in his study, and also with funds to cover his expenses. Green continued to be a member of the faculty of the University of Minnesota until his death in 1947; but subsequent to 1924 he devoted a substantial portion of his time to work with the Fromm brothers and the subsequently organized Fromm fur corporations, on problems pertaining to the health of their fur-bearing animals. Most of this work was carried on *99 by him and his associates at Millard Hall on the campus of the University of Minnesota. The foxes supplied to him by the Fromms for use in his study, were initially kept by him in retention pens located on premises which he owned at Hager City, Wisconsin, and also on other premises located at Lake Alexander, Minnesota - both of which premises were only a short distance from the University, but several hundred miles from the Fromm ranches. Later, in about 1934, his use of the facilities at Hager City was discontinued in favor of more extensive space within which to keep such animals, on the ranch of Fromm Bros. Inc. at Hamburg. And subsequently in 1935, the use of these Hamburg facilities likewise was discontinued in favor of still more adequate facilities on a ranch at Grafton, Wisconsin (located about 5 miles from Thiensville), which was purchased in 1935 by the Fromm-Nieman corporation. This latter property, known as "Lakefield," is hereinafter more fully described. Within a relatively short time after Green began his diagnostic work in 1924, he concluded that one of the diseases afflicting the Fromm silver foxes was "fox encephalitis." He thereupon developed a serum for the prevention *100 and treatment of this disease, by a method which was substantially as follows. First, live encephalitis virus, obtained from the tissues of silver foxes which had died of that disease, was injected into a selected group of red foxes. The result was that some of this group of red foxes died of the disease, but those which survived developed protective anti-bodies in their blood, which tended to protect them. Thereafter, at biweekly intervals extending over a period of about one year, additional injections of encephalitis virus would be given the surviving red foxes; and such repeated injections had the effect of ultimately creating a maximum concentration of protective antibodies in their blood, which made them "hyper-immune." Blood of these hyperimmune red foxes was then drawn off, allowed to coagulate, and thereupon put into a centrifuge which extracted the serum containing the anti-bodies. The serum so produced could thereafter be used, either as a prophylactic for conferring immunity on non-diseased foxes, or as a remedy for the treatment of encephalitis in infected animals. As hereinafter shown, large amounts of such serum were used from about 1929 to 1939 to inoculate most of *101 the silver fox pups of the four Fromm fur corporations, without any separate charge being made therefor. During the time that Green was carrying on such work with respect to encephalitis, he concluded that another disease which existed in the Fromm silver fox herds, was "distemper." Thereupon, by using substantially the same techniques which he had employed in producing the serum for fox encephalitis, he developed a serum for fox distemper. During 1936 or 1937, this distemper serum likewise was used to inoculate the Fromm fox herds, without any separate charge being made therefor. Up until 1929 when Fromm Bros. Inc. and the Fromm-Nieman corporation were organized, the four Fromm brothers paid all the expenses and furnished all of the animals incident to Green's work at the University of Minnesota. Thereafter, from 1929 through 1944, substantially all of Green's expenses at the University of Minnesota and also certain amounts paid to him and his associates as salary, were paid initially either by Fromm Bros. Inc. or by the Fromm-Nieman corporation; and the same were then, at least from 1933 through 1944, allocated among all four of the Fromm fur corporations on the basis of the *102 number of breeder animals which each owned. The amounts so allocated were then, as in the case of the other expenses above mentioned, taken by these corporations into their books of account as current operating expenses, and were deducted by them as operating expenses on their Federal income tax returns. Facts re Organization of Petitioner and Its Assets, Income, and Operating Expenses from 1933 through 1944 In about 1933 Green anticipated that his work on the control of animal diseases might result in the development of patents having commercial value. Accordingly, with a view to protecting his interests, he suggested to Edward Fromm that a corporation be created, in which he would have an interest and to which title to any such possible patents would be assigned. Edward Fromm agreed with this suggestion; and the result was that, on July 29, 1933, the petitioner corporation was organized under the laws of the State of Wisconsin. The original name under which petitioner was organized, was Fromm-Green Research, Inc.; but, in 1939, the name was changed to that presently used. The directors, until 1939, were Edward Fromm, Walter Fromm and Green. And the officers during this same *103 period were: Edward Fromm, president; Green, vice-president; and Walter Fromm, secretary-treasurer. Petitioner, at the time of incorporation, issued 500 shares of common stock without par value, in consideration for assets received from the stockholders which had a stated value of $16,000, and which are hereinafter described. No other or additional shares of stock were issued at any subsequent time. Said shares were issued originally, as follows: Shares
Fromm Bros. Inc.
253
Edward Fromm
1
Walter Fromm
1
R. G. Green
245
Total
500
It was agreed among petitioner's incorporators that any patents which Green might thereafter obtain as the result of his work, would be assigned by him to the petitioner; and that the same would, upon adjustment of accounts, become the corporation's property. Also, there was an informal understanding between Fromm Bros. Inc., and the other three Fromm fur corporations that, if and when patents having commercial value were so assigned to petitioner, some of the shares of stock which had been issued to Fromm Bros. Inc. would be transferred by it to the other three Fromm fur corporations. Subsequently on October 17, 1939, after *104 Green had obtained one patent pertaining to a distemper vaccine, and had filed applications for two other related patents (all of which are hereinafter more fully described), the following events respecting the petitioner occurred: Fromm Bros. Inc. transferred portions of its shares of petitioner's stock, as follows: 5 shares to Green, of which one was issued in the name of Green's attorney, Harlan B. Strong; 94 shares to the Fromm-Nieman corporation; 38 shares to Federal Silver Fox Farms; and 12 shares to From Bros. Silvercross Fox Farm, Inc. All these transfers were made at the price of $32 per share, which was equal to the book value of such shares at the time of petitioner's incorporation. At all times thereafter until after Green's death in 1947, the shares of petitioner's stock were held as follows: Shares
Fromm Bros. Inc.
104
Fromm-Nieman
94
Federal Farms
38
Silvercross Farm
12
Edward Fromm
1
Walter Fromm
1
R. G. Green
249
Harlan B. Strong
1
(Green's attorney)
Total
500
Strong was elected a director of petitioner; and he also was substituted for Green as vice-president. The other original directors and officers continued in office; and *105 no other changes of officers or directors occurred until after Green's death in 1947. Green, at this same time, assigned to the petitioner his rights in the above-mentioned patent and applications for patents. These were not, however, entered at that time as assets in petitioner's books of account; and they were not subsequently so entered until May 31, 1946, following an adjustment of accounts between Green, the petitioner, and the Fromm-Nieman corporation. As regards the assets of petitioner during the period from 1933 through 1944, its opening balance sheet reflected the following: Assets
Cash
None
Accounts receivable
$ 1,964.00
Inventory
5,850.17
Land
5,250.00
Machinery and equipment
7,211.52
Delivery equipment
494.00
Total assets
$20,769.69
Less: Reserve for depreciation
1,782.69
Net assets
$18,987.00
Liabilities and Net Worth
Accounts payable
$ 2,987.00
Capital stock
16,000.00
Total
$18,987.00
Within a year after incorporation, petitioner sold its land and also certain of its equipment, at a loss of $1,200. Thereafter through the year 1940, the maximum amount of depreciable assets reflected on its balance sheet for any year *106 was not in excess of $7,187.71. The character of such depreciable assets, together with the maximum amounts so reflected therefor, were as follows: Building
$ 481.97
Equipment
684.89
Automobile
494.00
Fox pens
4,599.40
Refrigerator
927.45
Total
$7,187.71
In 1941 petitioner disposed of all its remaining depreciable physical assets; and thereafter until the close of its fiscal year ended May 31, 1945, the only assets shown on its balance sheets were: Cash, in amounts of less than $450; and inventories of animals kept at or near the University of Minnesota, in amounts ranging from a maximum of about $6,200 in its fiscal year 1941, to a minimum of about $2,800 in its fiscal year 1945. Regarding petitioner's gross income for the period from 1933 through 1945, all such income reported on its income tax returns for said years, was derived solely from sales of the pelts of animals carried in its inventory. The amount of such gross income reported on its income tax returns for said period, were as follows: Fiscal year
ended May 31
1934
$ 4,287.91
1935
6,883.14
1936
9,719.41
1937
4,591.54
1938
16,252.06
1939
11,917.45
1940
8,241.78
1941
11,031.65
1942
5,700.44
1943
9,145.20
1944
7,610.10
1945
10,738.25
Total
$106,118.93
*107 As regards petitioner's operating expenses during the period of 1933 through 1945, the amounts of its total charges against gross income (including cost of goods sold, salaries and wages, and other miscellaneous operating expenses), as reported on its returns for said period, ranged from a low of about $4,200 to a maximum of about $14,500. The total of such expenses for all of said period was $80,548.38. None of these expenses was capitalized. Petitioner had no laboratory or operating office of its own until 1945, when, as hereinafter shown, it purchased the laboratory at Lakefield from the Fromm-Nieman corporation, and financed the same principally by delivery of a purchase-money mortgage covering such property. Its books of account, from the time of its incorporation in 1933 until its purchase of the Lakefield property in 1945, were kept in the offices of the comptroller of the Fromm-Nieman corporation, at that company's ranch in Thiensville; and petitioner's income tax returns for said period were prepared by said comptroller. Petitioner's inventory of animals, during said period prior to 1945, represented principally those animals which were kept in the retention pens at *108 Lake Alexander. And its above-mentioned operating expenses represented certain items of the expenses incurred at the University of Minnesota, which were not included among the greater portion of such expenses that were, as above shown, paid initially by Fromm Bros. Inc. or the Fromm-Nieman corporation, and then allocated among the four Fromm fur corporations. Facts re Disease Control Work at Lakefield and University of Minnesota, from 1933 through 1944, and Allocation of Expenses of same among Fromm Fur Corporations In 1935, a serious outbreak of distemper occurred in the silver fox herds of the Fromm fur corporations. Thereupon, Green accelerated his efforts to develop a remedy which would have more positive and permanent effect than the serum that was then being used. And also, at about this same time, the Fromm-Nieman corporation purchased the property at "Lakefield," in order to provide more adequate diagnostic and laboratory facilities; and then joined with the other three Fromm fur corporations in thereafter operating the Lakefield property as a joint undertaking - under which the expenses of such operation, to the extent that they exceeded the income therefrom, were allocated *109 among and borne by all four of said Fromm fur corporations as part of their own current operating expenses. Such joint method of operation continued from 1935 until October 1945. Thereupon, as hereinafter shown, petitioner purchased the Lakefield properties and facilities from the Fromm-Nieman corporation, took over the active operation of the same, paid all the operating expenses, and itself derived the income resulting from such operation. The Lakefield property, at the time it was purchased by the Fromm-Nieman corporation in early 1935, was an abandoned fox farm, located in Grafton near the ranch of said corporation. It had on it various facilities for the retention and raising of foxes, such as fenced-in areas and kennels; and it also had some buildings which were adaptable for laboratory use. These facilities were improved; and thereafter all four Fromm fur corporations sent to Lakefield, not only the carcasses of foxes which had died on their ranges, for use in post-mortem examinations, but they also sent there live foxes for diagnosis and treatment. Green transferred to Lakefield, Walter Carlson who had been assisting in the work at the University of Minnesota, to take charge *110 of the laboratory work; and he then told Carlson: "We have one purpose in mind and that is to solve Fromm's disease problems." After Lakefield was so acquired, Green continued as before to do most of his work on the disease problem at the University of Minnesota where he was still a member of the faculty. He did however, from time to time, make trips to Lakefield to direct the work which was there being handled. His major efforts, beginning in said year 1935, were directed toward the development of a modified live-virus vaccine for fox distemper. The method employed in this regard, which embodied basic principles then being used in the medical field to produce other kinds of vaccine, was to pass the distemper virus successively through a number of ferrets. The theory of such method (called "passage through generations" of a "host animal" that is different from but related to the animal for which the remedy was being sought - in this case the fox) was that such successive "passages" would gradually modify or attenuate the distemper virus; and that thereafter a vaccine containing such attenuated virus could be used to inoculate silver foxes without causing their death, and thereby *111 enable them to develop their own protective anti-bodies. By about 1937, Green had proved the soundness of such method for developing a fox distemper vaccine; and he thereupon applied for a patent covering the process. This patent (United States Patent No. 2,136,131) was granted to him in November 1938. Also, in February 1939, he filed applications for two related patents pertaining to distemper vaccines, which were produced by serial passage of the distemper virus through minks, weasels, stoats and martens; and one of which vaccines was intended to prevent distemper in minks. Each of these two related applications for patents was predicated on the same basic principle that was embodied in the prior 1938 distemper patent; and the amount of activity directed toward each was much less than that involved in the development of the 1938 patent. It was said 1938 patent and said two related applications for patents which were, as heretofore found, assigned by Green to the petitioner in October 1939. Thereafter in February 1942, patents on said related applications (United States Patent Nos. 2,271,818 and 2,271,819) were granted to petitioner, as assignee of Green. None of the above three *112 patents was, however, included by petitioner among the assets shown on its books and in its balance sheets until May 31, 1946, following an adjustment of accounts. Throughout the period from 1938 through 1944, the fox distemper vaccine which Green had so developed, was produced at Lakefield; and as hereinafter shown, large quantities of the vaccine so produced were used for injecting animals belonging to the four Fromm fur corporations. All expenses of so producing the same, were entered as current operating expenses in the so-called "Lakefield Accounts" (hereinafter described) on the books of the Fromm-Nieman corporation; and then the net amount of such expense, after the same had been offset by income derived from the Lakefield operations, was allocated among and borne by all four of the Fromm fur corporations as part of their own current operating expenses. No separate charge was made to any of said corporations for the vaccine supplied to them. At about the same time that Green was developing the above-mentioned vaccine for fox distemper, he also attempted to develop a vaccine for "fox encephalitis." In such attempt, he tried three different methods - none of which involved *113 principles or techniques which were not previously known in the medical field. One of these methods was the simultaneous injection of foxes with both live encephalitis virus and a hyperimmune serum; but this method was soon abandoned as being unsatisfactory. The second method involved substantially the same principles and techniques which Green had used in developing the above-mentioned modified live virus vaccine for fox distemper; but this also proved unsuccessful, because of inability to find a suitable "host animal" through which to pass the encephalitis virus. And the third method was to develop a "killed virus" vaccine by inactivating the encephalitis virus with formaldehyde, rather than by passage through generations of a host animal. By about 1939 or 1940, Green succeeded, through use of the third of these methods, in developing a safe and effective encephalitis vaccine. Thereafter, no change in such method was made, although some subsequent changes were made in the size of the dosages applied. The process was never patented. However, during all years from 1938 through 1944, large quantities of this encephalitis vaccine were produced at Lakefield; and most of these were used *114 to inject animals belonging to the four Fromm fur corporations. In the case of this vaccine also, none of the expenses of developing and producing the same were capitalized. Rather, all of such expenses were included as current operating expenses in the said Lakefield accounts of the Fromm-Nieman corporation, for subsequent allocation among the four Fromm fur corporations; and these corporations thereafter treated the amounts so allocated, on their books and in their income tax returns, as part of their own current operating expenses. Here again, no separate charge was made to any of these corporations for the encephalitis vaccine supplied to them. The following table shows the number of dosage units of the above-mentioned serums and vaccines (produced at Lakefield beginning in 1935) which were supplied to the Fromm fur corporations during the years 1933 through 1944; and also the number of animals belonging to said corporations, which were injected with such serums and vaccines this same period: Dosage
Number of animals
units
injected
Year
Product
supplied
Fox
Mink
1933
Encephalitis serum
39,158
11,848
1934
Encephalitis serum
45,060
13,481
1935
Encephalitis serum
36,581
14,111
1936
Encephalitis serum
52,257
19,695
Distemper serum
52,257
Encephalitis serum
66,126
24,329
1937
Distemper serum
23,322
Distemper serum and virus
21,402
Encephalitis serum
89,487
33,980
1938
Encephalitis vaccine
28,331
Distemper vaccine
28,331
Encephalitis serum
92,354
41,163
175
1939
Encephalitis vaccine
29,490
Distemper vaccine
29,490
Distemper vaccine
27,477
35,426
370
1940
Encephalitis treatment
27,477
Distemper vaccine
29,713
30,996
3,145
1941
Encephalitis treatment
29,713
Distemper vaccine
29,754
31,090
16,900
1942
Encephalitis treatment
29,765
Distemper vaccine
29,131
30,398
13,454
1943
Encephalitis treatment
29,131
Distemper vaccine
26,371
27,290
14,237
1944
Encephalitis treatment
26,371
*115 Not more than about 10 per cent of all the serums and vaccines produced at Lakefield was used for experimental work; and the balance was either used for injecting the Fromm herds, or was sold to outside parties. In 1939, Green employed one of his graduate students at the University of Minnesota, Heinz A. Siedentopf, to work on a method for preserving the serums and vaccines which were being produced at Lakefield. Siedentopf accepted such employment, at a salary of $100 per month. Such work, however, did not require more than 20 to 30 per cent of his time; and during the remainder of his time, he assisted Green with post-mortem examinations on fox carcasses received from the Fromm fur corporations. By 1941, Siedentopf succeeded in developing a method for preserving the serums and vaccines, by a drying process called "desiccation"; and he then applied for a patent covering the process. Such patent (United States Patent No. 2,380,399) was granted to petitioner, as assignee of Siedentopf, in July 1945 - which was shortly prior to the time when petitioner purchased the Lakefield property in said year. The entire cost of developing the desiccation process covered by this patent did not *116 exceed $10,000. None of the amount was capitalized; but rather it was included among the expenses incurred at Lakefield and the University of Minnesota, which were paid initially by Fromm Bros. Inc. or the Fromm-Nieman corporation, and which were then allocated among the four Fromm fur corporations and included in their accounts and deducted on their returns, as current operating expenses. In 1940, a new laboratory building (known as Building #3) was erected at Lakefield. The cost of this building was entered as an asset in the said Lakefield Accounts on the books of the Fromm-Nieman corporation. And thereafter, in each of the years 1940 through 1944, charges for depreciation on this building, and also charges for interest on Fromm-Nieman's investment therein, were included as current operating expenses in the said Lakefield Accounts, and were then allocated among and borne by the four Fromm fur corporations. The diagnostic work handled at Lakefield was performed principally for the Fromm fur corporations; but after about 1938 or 1939, diagnostic services were rendered also to veterinarians and outside fur ranchers. Not all of this work pertained to the fox diseases above mentioned, *117 or to the processes covered by the above-mentioned patents; but rather, it pertained also to such animal diseases as Chasteek paralysis (a vitamin B-1 deficiency), lungworm, and hookworm. All income derived from the performance of such services for outside parties, and also all expenses incurred for such work performed either for the Fromms or for outside parties, were taken into the above-mentioned Lakefield Accounts on the Fromm-Nieman books. In all years from 1935 through 1944, a substantial number of breeder silver foxes belonging to the Fromm-Nieman corporation and to Federal Silver Fox Farms, Inc. were kept at Lakefield. The offspring of these animals, like those raised on the ranches of all the Fromm fur corporations, were sent to the furring range of Fromm Bros. Inc.; and thereafter, they were there killed and pelted, and their pelts were sold. During the years 1938 through 1943 alone, 5,223 silver foxes were so raised at Lakefield; and 4,490 of these were sent to said furring range. The expenses of such activity were included in the said Lakefield Accounts, and were then allocated to the corporations which owned said foxes, on the basis of the number of meals provided for *118 the foxes belonging to each. Another activity carried on at Lakefield beginning with the year 1940, was the production and sale of vaccine for the treatment of distemper in dogs. During the time that Green was developing the above-mentioned distemper vaccine for foxes, he found that this same vaccine was effective also for dogs; and, realizing the commercial possibility of this, he made application to the United States Department of Agriculture for a license to sell the same, as a canine distemper vaccine under the name of "Distemperiod." The obtaining of such a license was a necessary prerequisite to the sale of medicines for the treatment of domestic animals; but it was not necessary for the sale of medicines for use on non-domesticated animals, such as foxes. The Department required that the safety and effectiveness of the vaccine be first established; and accordingly, during the years 1940 through 1942, it granted only limited licenses, under which the vaccine could be sold only to graduate veterinarians who would observe its effect and submit written reports, called "protocols," as to their observations. In January 1943, after the safety and effectiveness of the vaccine for *119 use on dogs had been established through such protocols, a general license in the name of petitioner was granted for unrestricted sale of the distemper vaccine, under said name of "Distemperiod." This general license was not granted for any fixed period of time, and was to remain in effect until revoked by the Department. From 1940 until 1945, all income from the sale of said Distemperiod, and also all expenses pertaining to its production and sale, were included in the above-mentioned Lakefield Accounts on the books of the Fromm-Nieman corporation, with respect to which the allocations were made among the four Fromm fur corporations. None of such income or expenses was allocated to, or taken into the accounts of petitioner, in whose name the licenses had been granted. In 1944 or 1945, the above-mentioned Siedentopf came to Lakefield, and took charge of the work there. Green, who remained at the University of Minnesota, continued to be the general director. At this time Green instructed Siedentopf, as he had previously instructed Walter Carlson in 1935, that he was to have "foremost in [his] thoughts Fromm foxes and mink, and their welfare." As regards the above-mentioned "Lakefield *120 Accounts," the manner in which these accounts were set up, and the manner in which the net amounts of expenses entered for the years 1935 through 1944 were allocated among the four Fromm fur corporations, were as follows. Shortly after the Fromm-Nieman corporation purchased the Lakefield properties in early 1935, it set up in its general ledger a new series of accounts, which are those known as the "Lakefield Accounts." These accounts were established pursuant to the directions of Edward Fromm, who was the president of all four of the Fromm fur corporations, and also the president of petitioner. And the accounts were handled, at all times thereafter until petitioner's purchase of the Lakefield laboratory and facilities in 1945, by Walter Gruett. This individual was the comptroller and office manager of the Fromm-Nieman corporation; he supervised the books and records, both of petitioner and of all the Fromm fur corporations except Fromm Bros. Inc.; and he also prepared the income tax returns both of petitioner and of all four Fromm fur corporations. Included in these Lakefield Accounts were several asset accounts which carried designations, such as "Lakefield Land," "Lakefield Buildings, *121 " and "Lakefield Equipment"; various profit and loss expense accounts, carrying designations such as "Lakefield Purchases," "Lakefield Supplies," and "Lakefield Labor"; and also an income account, designated "Lakefield Income," in which were entered proceeds from sales of Distemperoid and animal pelts, and fees for diagnostic services rendered to outsiders. In these accounts, entries were currently made under the appropriate headings of all items of income and all items of expense pertaining to the Lakefield properties and the operations carried on there. At the end of each year, Gruett assembled into what may be called a clearing account, the balances of the various Lakefield profit and loss expense accounts; added to the aggregate of these, the cost of feeding all animals kept and raised at Lakefield, plus certain overhead expenses such as taxes and insurance; and then deducted from the total of all the foregoing, the balance in the Lakefield income account, in order to determine the net expense of maintaining and operating Lakefield for the particular year. And finally, Gruett apportioned the net expense of operating Lakefield, as so determined, among all four Fromm fur corporations *122 on the basis of the number of breeder animals which said corporations had on their respective farms at the beginning of each particular year. The amounts of said net expenses of operating Lakefield for the years 1935 through 1944, which were so determined and so allocated, were as follows: Year
1935
$ 52,470.20
1936
23,073.04
1937
44,172.52
1938
55,328.15
1939
49,781.59
1940
72,085.38
1941
41,902.46
1942
44,967.77
1943
73,037.25
1944
47,091.63
Total
$503,909.99
After assembling the Lakefield income and expense accounts at the close of each year, Gruett prepared an instrument (herein called a distribution schedule) which showed in detail the several items of income and expense that he had taken into consideration in determining the net expense of operating Lakefield, and which also showed the portion of the same which he had allocated to each of the four Fromm fur corporations. The schedule prepared for the year 1943, which is typical of the manner in which these schedules were prepared for all of the years 1935 through 1944, was in substance, as follows: Lakefield Expense Accounts: Labor, including Green's salary of
$7,750
$ 43,980.08
Other Lakefield operating expenses
59,821.36
Expenses at University of Minne-
sota
4,551.20
Lakefield overhead (including
taxes and insurance)
2,450.38
Animal feed and miscellaneous ex-
penses at Thiensville ranches
32,469.84
Depreciation on Lakefield build-
ings and equipment
6,482.09
Interest on Fromm-Nieman invest-
ment in Lakefield land, buildings
and equipment
2,499.84
Total expenses
$152,254.79
Less: Amounts credited to Lakefield
income account
79,217.54
Net expense of operating Lakefield
(designated on distribution sched-
ule as "Cost of Farms Serum &
Vaccine")
$ 73,037.25
Apportionment of above 1943 net op-
erating expense: Fromm Bros. Nieman & Co.
$ 30,169.71
Federal Silver Fox Farms, Inc.
10,733.04
Fromm Bros. Silvercross Fox
Farm, Inc.
5,308.35
Fromm Bros. Inc.
26,826.15
$ 73,037.25
*123 In addition to the above-described Lakefield expenses which were designated as "Cost of Farms Serum and Vaccine" and which were allocated among all four Fromm fur corporations, there were certain other expenses included in the Lakefield Accounts which were allocated only between the Fromm-Nieman corporation and Federal Silver Fox Farms, Inc. These last-mentioned expenses were those incurred in connection with the previously mentioned activity of raising at Lakefield, breeder animals and their offspring which belonged to said two corporations. The amounts of these expenses for the years 1936 through 1944, were: 1936
$ 12,838.22
1937
31,647.01
1938
18,576.25
1939
14,384.11
1940
16,099.94
1941
24,677.60
1942
26,086.78
1943
37,883.67
1944
4,264.95
Total
$186,458.53
As regards the expenses incurred by Green at the University of Minnesota during the years 1933 through 1944, these were paid initially, as heretofore found, by Fromm Bros. Inc. or by the Fromm-Nieman corporation (except for small portions thereof, which either were paid by petitioner or were included in the Lakefield Accounts as above shown). The amounts of expenses so paid by Fromm Bros. *124 Inc. and the Fromm-Nieman corporation, were then (except for the year 1933) allocated and distributed periodically among the four Fromm fur corporations, on the basis of the number of breeder animals which each owned. These Minnesota expenses included such items as: Salaries for Green and his assistants; animals and supplies; payments to the University of Minnesota for the use of its laboratory facilities; and legal fees and expenses relative to patents. The aggregate amounts of such expenses for the years 1933 through 1944 were as follows: Year
Amount
1933
$ 6,150.00
1934
18,898.64
1935
6,856.35
1936
6,515.04
1937
14,485.52
1938
18,409.37
1939
19,285.68
1940
22,182.73
1941
20,160.66
1942
14,874.83
1943
14,624.01
1944
18,323.58
Total
$180,766.41
All of the various above-mentioned amounts allocated and distributed to the several Fromm fur corporations, in respect of both the Lakefield accounts and the expenses incurred at the University of Minnesota, were included by the corporations to which the allocations were made, in their respective books of account, and were deducted on their respective Federal income tax returns, as their own current *125 operating expenses. The deductions were taken on their returns under such designations as, "Disease expense," "Lakefield expense," or "Research disease." None of such expenses were capitalized. The Federal income tax returns of the four Fromm fur corporations for the years 1933 through 1944, on which the above-mentioned allocated expenses were deducted, were audited by the Internal Revenue Service. In the course of such audits, no adjustments were made with respect to such allocated amounts, or to their classification as current operating expenses. In 1943, a nationally known accounting firm made a consolidated audit of the books of all four Fromm fur corporations, for the calendar year 1942. In the written audit report which this accounting firm prepared and submitted with respect to such examination, it made no adjustment to any of the above-mentioned allocated amounts which had been included in the operating expenses of each of said fur corporations. Also, in a consolidated balance sheet which the accounting firm attached to its report, it showed that the aggregate equity investment of all four Fromm fur corporations in the petitioner, was $8,500. This amount is approximately *126 equal to 50 per cent of the stated value of the capital assets which petitioner received for its shares of stock, at the time it was incorporated. None of the income or expenses included in any of the Lakefield Accounts, or any of the Minnesota expenses which were paid initially by Fromm Bros. Inc., or by the Fromm-Nieman corporation, were allocated to the petitioner. None of such expenses was paid by petitioner itself. Also none of these expenses was from year to year treated by any of the Fromm fur corporations or by the petitioner itself, as a contribution to the capital or paid-in surplus of the petitioner; rather, as above found, each of the Fromm fur corporations treated the amounts allocated to it, as part of its own operating expenses and deducted the same as current operating expenses on its income tax returns. The petitioner did not include in its accounts or report on its income tax returns any of the income from the operation of Lakefield for any of the years 1935 through 1944. Nor did petitioner, from year to year, enter in its accounts or deduct on its returns any portion of the expenses which were included in the Lakefield Accounts for said years, or any of those *127 Minnesota expenses which were paid initially by Fromm Bros. Inc., or by the Fromm-Nieman corporation. Facts re Period Subsequent to 1944 In about October 1945, petitioner bought from Fromm-Nieman corporation the above-mentioned Lakefield properties, including the land, buildings, equipment, and other operating facilities. Petitioner's stockholders did not, in connection with such acquisition, pay in any additional capital or surplus. The price paid for the properties (the amount of which is not established) was represented principally by a purchase-money mortgage of $50,000; and the balance appears to have been represented by other indebtedness included in petitioner's accounts payable. Also, as of May 31, 1946, petitioner included for the first time among the assets on its books, "Patents" at a cost of $10,587.91. These patents were those which, as heretofore found, were previously assigned to petitioner, subject to an adjustment of accounts. Such adjustment of accounts was effected at about the time such book entry was made, by making a counter-credit to Green's drawing account, in the same amount of $10,587.91. Also at about this same time, there was an adjustment of accounts *128 between Green and the Fromm-Nieman corporation. The effect of the foregoing acquisitions, which gave petitioner more assets and greater liabilities than it had possessed at any previous time since its incorporation, is reflected by increases in petitioner's capital assets and in its accounts and mortgages payable, as shown on its balance sheets as of the close of the following years: Fiscal Year Ended in
1944
1945
1946
Capital Assets: Depreciable assets
(net)
None
$8,071.65
$67,374.41
Land
None
None
4,000.00
Patents
None
None
10,587.91
Total
None
$8,071.65
$81,962.32
Accounts and Mort-
gages Payable: Accounts payable
None
None
$32,590.86
Mortgages
None
None
50,000.00
Total
None
None
$82,590.86
Upon petitioner's purchase of said Lakefield properties and facilities, it took over the operations which were then being conducted at Lakefield; and thereafter, it operated such properties during all subsequent years here material. The enlargement of the scope and extent of petitioner's operations, which thus occurred, is reflected in the following summaries of its sales, cost of goods sold, and operating expenses, as reported *129 in its income tax returns for the following years: Fiscal Year Ending May 31
1944
1945
1946
Sales
$7,610.10
$10,738.25
$207,108.52
Cost of goods sold: Opening inventories
$4,885.07
$ 3,863.86
$ 2,857.69
Purchases
4,263.05
6,946.56
49,572.46
Salaries and wages
None
None
83,174.40
Other costs per books
None
None
6,954.57
Total
$9,148.12
$10,810.42
$142,559.12
Less: Closing inventories
3,863.86
2,857.69
2,857.69
Cost of goods sold
$5,284.26
$ 7,952.73
$139,701.43
Gross Profit
$2,325.84
$ 2,785.52
$ 67,407.09
Less: Deductible Operating Expenses: Rent
None
None
$ 737.97
Repairs
None
None
4,393.52
Interest
None
None
3,168.72
Taxes
85.48
119.35
2,689.41
Depreciation
None
None
6,954.72
Commissions
None
None
10,932.37
Travel expenses
None
None
11,742.37
Advertising
None
None
8,333.51
Shipping
None
None
1,600.21
Telephone & telegraph
None
None
1,902.56
Minnesota research
None
None
17,741.49
Legal
None
None
808.80
Total
$ 85.48
$ 119.35
$ 71,005.71
On October 8, 1945, Green, acting in accordance with a previous informal understanding, executed a written stock-option contract *130 with the four Fromm fur corporations, under which he agreed that neither he, his heirs, executors or administrators, would thereafter dispose of or encumber any of his shares of petitioner's stock, except as a whole, and only then after said shares had first been offered for sale to the Fromm fur corporations. Green was at all times aware that no patents were included among the assets on petitioner's books at any time prior to said adjustment of accounts on May 31, 1946. He was aware that, at no time prior to his death in 1947, was any asset carried on petitioner's book which represented the cost of any research or development of patents or processes. And also, he was familiar with the above-mentioned annual distribution schedules prepared by Fromm-Nieman's comptroller for the years 1935 through 1944, by means of which the various expenses incurred during said years at the University of Minnesota and at Lakefield, were allocated among and thereafter borne by the four Fromm fur corporations as part of their own current operating expenses. Upon Green's death in 1947, his shares of petitioner's capital stock passed to his personal representatives; and they continued to be held by *131 such representatives until 1957, when most of the same were acquired by Fromm Bros. Inc. Following Green's death, Seidentopf became the managing director of the laboratories at Lakefield. Prior thereto, in about 1946 or 1947, which was subsequent to petitioner's acquisition of the Lakefield properties, Seidentopf had learned from persons engaged in research on animal diseases who were not connected with the Fromm interests, that the virus which caused encephalitis in foxes (a brain disease) was the same as the virus which caused hepatitis in dogs (a liver disease); and he thereupon adapted the fox encephalitis vaccine which Green had developed to the treatment of dogs. This adaptation involved no original research. Thereafter, in December 1950, he obtained for petitioner a general license from the Department of Agriculture, which permitted petitioner to sell said hepatitis vaccine for use on dogs, under the trade-name of "Hepvac." This license was not granted for any specific period; and it was to remain in force until such time as it might be revoked by the Department. In 1951, which was more than 5 years after petitioner had taken over the operation of the Lakefield properties, *132 its comptroller, E. C. Koenig, made two adjustments on its books, which gave rise to the principal issues here involved. First, Koenig set up on petitioner's books a new depreciable asset account which he designated as "Research and Development Costs," in the amount of $771,765.17. And secondly, as a counter adjustment to the above, he set up a new capital account which he designated as "Paid-in Surplus," in the same amount. Each of these new accounts was based on a journal entry made as of May 31, 1951. No similar accounts had theretofore been included in petitioner's books at any time since its incorporation. The effects of such adjustments to petitioner's books were: (1) To enable petitioner to claim increased deductions for amortization and depreciation, for income tax purposes; (2) to enable petitioner to claim an enlarged credit for excess profits tax purposes; and (3) to enable petitioner to report either an operating loss or a reduced operating profit, for each of the taxable years here involved. The following table shows in round figures, the amounts of the gross sales and the amounts of the profits or losses (exclusive of net operating loss carryovers or carrybacks) which *133 were reported by petitioner on its income tax returns for the two years preceding the book adjustments made by Koenig, and for the taxable years here involved which followed such adjustments: Gross Sales
Profit or Loss
Before Koenig's
adjustments: 1949
$278,000
$24,000 profit
1950
235,000
46,000 profit
After Koenig's
adjustments: 1951
324,000
(7,000) loss
1952
334,000
(23,000) loss
1953
369,000
(29,000) loss
1954
583,000
32,000 profit
The procedure which Koenig followed, in setting up said new asset account and said new capital account on petitioner's books in 1951, and in determining the amount of $771,765.17 entered in each, was this. He first examined the books of the four Fromm fur corporations; and he then took out of the operating expense accounts included therein, those expenses incurred at the University of Minnesota and at Lakefield during the years 1933 through 1944, which had been allocated among said fur corporations in the manner heretofore found. Most of such expenses were included in the books either of Fromm Bros. Inc. or of the Fromm-Nieman corporation, which had paid such expenses in the first instance; and practically *134 all of such expenses for the years 1935 through 1944 were included in the above-mentioned Lakefield Accounts of the Fromm-Neiman corporation. Koenig's next steps in setting up said new accounts were: (1) To treat the aggregate amounts of the expenses which he so selected for each year, as having been "contributed" to petitioner by the four Fromm fur corporations, in cash and as "paid-in surplus," from year to year when such expenses were paid; (2) to treat all the amounts so regarded to have been "contributed," as having been expended by petitioner, rather than by Fromm Bros. Inc. or Fromm-Nieman; (3) to treat all of said amounts as capital expenditures, rather than current operating expenses; and (4) to include all of said amounts among petitioner's assets, as the amortizable "costs" of the patents and processes which it was using in the taxable years here involved. And finally, Koenig attributed to said new asset a useful life of 17 years from November 1938, which was the date on which its first patent was granted to Green. It was this and other patents which had separately and previously been capitalized in 1946 at a cost of $10,587.91. Koenig made all the above selections and *135 determinations without having made any detailed examination of the books of the Fromm fur corporations except for the years 1940 and 1942; without having been employed by any of the Fromm corporations during the years 1933 through 1944, when said expenditures were made, and when they were currently classified as current operating expenses rather than as capital expenditures; and without having had any training or experience with the development and production of medicines for animal diseases. Also, in making the said adjustments to petitioner's books, he did not charge petitioner with any of the income derived at Lakefield during the years 1935 throughout 1944. Nor did he capitalize all the expenses which had been incurred at Lakefield; rather he capitalized only that portion of such expenses which remained after the same had been reduced by the Lakefield income for the abovementioned years. The petitioner, in its income tax return for each of its taxable years 1951 through 1954 which are here involved, claimed deductions of $55,120.90 per year, for amortization of the above-mentioned "cost" of $771,765.17 for the new asset which Koenig had set up on its books in 1951 for the first *136 time. The respondent, in his notices of deficiency herein, disallowed all these deductions; but he did allow all other deductions which petitioner had claimed for depreciation or amortization of assets, including the deduction claimed for depreciation of the "Patents" which had been entered in petitioner's books in 1946, at the cost of $10,587.91. Respondent then computed the deficiencies here involved, by giving effect to such disallowances, and by computing the excess profits tax portion of the liabilities through application of the income credit method. Thereafter the petitioner, in its original petitions filed herein, not only reasserted its claim to the above-mentioned deductions of $55,120.90 per year, but also claimed the rights: (1) To have its excess profits tax for the years 1951, 1952, and 1954, computed in accordance with the invested capital method; and (2) to have included in its equity invested capital, said amount of $771,765.17 which Koenig had treated as having been "contributed" to petitioner by the four Fromm fur corporations from year to year during the period 1933 through 1944, and which he had entered on petitioner's books for the first time in 1951 as "paid-in *137 suplus." Respondent, in his answers to said original petitions, denied all these claims. Subsequently the petitioner, in amended petitions filed herein on May 28, 1958, not only again claimed the above-mentioned deductions asserted in its original petitions, but also claimed new and additional deductions of $71,899.24 for the taxable year 1951, and of $106,837.08 for each of the taxable years 1952, 1953, and 1954. These new claimed deductions were alleged to represent amortization of additional "costs" of $1,107,701.10, incurred by it during the years 1933 through 1944, for "research and development expenses and/or cost of patents and processes." Thus, the totals of both the original amounts and the additional amounts so claimed as deductions for amortization of research and development "costs" for processes and patents (over and above the amortization deductions allowed by the respondent on the separate "patent" cost of $10,587.91) are: $127,020.14 for the taxable year 1951; and $161,957.98 for each of the taxable years 1952, 1953 and 1954. The respondent in his answers to the amended petitions denied all of petitioner's claims. Petitioner's claim to the last-mentioned additional *138 "costs" of $1,107,701.10 is based on the ground that the four Fromm fur corporations "contributed" to it from year to year during the period from 1933 through 1944, not only the above-mentioned cash amounts of $771,765.17 (in respect of which deductions for amortization were claimed in its original petitions), but also property and services having both "costs" and "fair market values," as follows: Cost to the four Fromm fur cor-
porations of raising the foxes or
minks which died during the
years 1933 through 1944, as the
alleged result of the injection
of serums and vaccines….
$ 958,668.00
Cost to said corporations, of labor
alleged to have been used in
the injection of such animals.
149,033.10
Total
$1,107,701.10 [2]
*139 Petitioner, in computing the deductions for amortization of said claimed additional "costs" of $1,107,701.10, divided such costs into two portions relating to two different assets, and then assigned a different amortizable life to each such asset. It regarded $627,386.01 of said "costs" as representing property and services which the Fromm fur corporations had "contributed" to it during the years 1933 through 1944, in connection with the development of patents and processes pertaining to distemper and desiccation; and, in amortizing such asset, it employed a useful life of 17 years from November 1938 - being the date on which the first distemper patent was issued to Green. And, as regards the balance of said "costs" of $1,107,701.10 (or $480,315.09), petitioner treated this as representing property and services which the four Fromm fur corporations had "contributed" to it during the years 1933 through 1944, in connection with the development of its unpatented hepatitis vaccine; and, as to this, it employed a useful life of 10 years from December 17, 1950 - being the date on which the Department of Agriculture granted it a license, of indefinite term, to sell hepatitis vaccine for *140 use on dogs. No portion of the above-described items making up said alleged additional "costs" of $1,107,701.10 were entered on petitioner's books of account, either as assets or as "contributions" to paid-in surplus, at any time from its incorporation through the taxable years involved. None of such costs was actually paid or incurred by the petitioner. Rather all of the same were paid or incurred by one or another of the four Fromm fur corporations; were included in the books of such fur corporations, either as operating expenses (such as the labor) or as part of their costs of goods sold (such as that portion of the costs of producing the pelts sold, which was attributable to raising animals which died in the course of such process); and were reflected as such expenses or costs in the income tax returns of said Fromm fur corporations. There is no entry on the books of any of the Fromm fur corporations, indicating that any such contributions were made. No portion of said expenses or costs were "contributed" by any of the Fromm fur corporations to the petitioner. Facts re Inventory Issue As of May 31, 1951 (which was the end of the fiscal year 1951), petitioner's above-mentioned *141 comptroller Koenig set up on petitioner's books, as of the beginning of said year, an opening inventory of $9,208.52 for biological products on hand; and as of the same time, he set up an inventory of such products as of the close of said year, in the amount of $10,319.93. Koenig then used these new opening and closing inventories on petitioner's Federal income tax return for 1951, to determine the cost of goods sold. Koenig determined the amount of the above-mentioned opening inventory solely on the basis of estimate; but he determined the closing inventory by a physical count of biological products. Prior to the time when Koenig made said entries at the end of the year 1951, petitioner had never employed inventories with respect to biological products, i.e., serums and vaccines. It had in the earlier years 1946 through 1948 used inventories of animals; but in 1950, it had no opening inventory and no closing inventory, either of animals or of biological products. Petitioner did not at any time request or obtain permission from the Commissioner of Internal Revenue to change its method of accounting or its method of reporting inventories. The respondent, in his notice of deficiency *142 in Docket No. 57348, determined that, in the absence of any inventory of biological products on petitioner's books at the beginning of its fiscal year 1951, it had not established its right to use such an opening inventory of $9,208.52 for that year. Opinion 1. The first issue is whether the petitioner is entitled to additional deductions for depreciation or amortization of intangible assets, for which it claims "costs" in cash of $771,765.17, and further "costs" in property and services of $1,107,701.10 - or total "costs" of $1,879,466.27. Petitioner contends that said intangible assets are represented by research and development costs which were incurred by it from year to year during the period of 1933 through 1944, in connection with its patents and processes pertaining to the treatment of animal diseases. It also contends that the expenditures entering into such "costs" were contributed to it as "paid-in surplus," by certain of its stockholders (the four Fromm fur corporations) from year to year during said 1933-1944 period, when the expenditures were made by these corporations. And it further contends that said stockholders erred in classifying such expenditures, in their *143 books of account and in their income tax returns, as part of their own current operating expenses; and that instead, such expenditures should have been treated by the stockholders as additional investments by them in the petitioner, and should concurrently have been set up on petitioner's books, both as capital assets and as paid-in surplus. The solution of this issue requires, as we have heretofore stated, consideration of certain subsidiary questions, such as: Whether said claimed "costs" actually were incurred by the petitioner itself; whether such "costs" actually were contributed to petitioner from year to year during the 1933-1944 period, by the four Fromm fur corporations as "paid-in surplus"; and whether the various expenditures entering into such "costs" were in point of fact made by said Fromm fur corporations for the purpose of acquiring capital assets, rather than for the purpose of defraying current expenses incident to the operation of their own businesses. All these subsidiary questions are either pure questions of fact, or mixed questions of law and fact, which must be resolved, for the most part, by our consideration and weighing of all the material facts and circumstances. *144 We have hereinabove, in our Findings of Fact, set forth in considerable detail all the material facts and circumstances established by the evidence. The Internal Revenue Code of 1939 which is here controlling, makes provision in section 23(1)(1) thereof, for the allowance of deductions for depreciation or amortization of assets used by a taxpayer in its trade or business. The theory underlying said allowance was recently stated by the Supreme Court in Massey Motors, Inc. v. United States, 364 U.S. 92, as follows: "It was the design of the Congress to permit the taxpayer to recover, tax free, the total cost to him of such capital assets * * *." (Italics supplied.) Similarly, in Detroit Edison Co., 45 B.T.A. 358, 361, affirmed (C.A. 6) 131 F. 2d 619, and also affirmed 319 U.S. 98, this Court said: It is fundamental that the depreciation deduction is allowed upon a capital investment. Where a taxpayer has no capital investment in property it *145 is not entitled to a depreciation allowance in respect of the capital asset. The essential requirements of a capital investment are the laying out of money or money's worth and the acquisition of something of permanent use or value in the business. La Belle Iron Works v. United States, 256 U.S. 377. The mere ownership of property which cost the owner nothing does not give rise to the right of a depreciation allowance. The foregoing authorities make it plain that any cost sought to be amortized must represent expenditures made for the acquisition of a capital asset - that is, an asset having a useful life extending over a period of more than one year, as distinguished from mere current operating expenses. Also, even if a capital asset has been acquired, no deduction will be allowed for depreciation or amortization thereof, unless the useful life of such asset is either fixed or determinable. Coca-Cola Bottling Co., 6 B.T.A. 1333; Rev. Ruling 56-520, 1956-2 C.B. 170; 4 Mertens, Law of Federal Income Taxation, Sec. 23.12. In the instant case, the respondent denied all the claimed additional deductions here involved; and accordingly, the *146 petitioner has the burden of establishing its right to such deductions, by bringing itself within the principles embraced in the statute and authorities above cited. We think that petitioner has failed to carry such burden. As regards the claimed cash costs of $771,765.17, we are convinced from our examination and weighing of all the material facts and circumstances, that the expenditures making up such "costs" were not, in fact, paid or incurred by petitioner; and we are convinced also that none of the same was contributed to petitioner by any of its stockholders. To the contrary, the evidence establishes that all these expenditures were incurred and paid either by Fromm Bros. Inc., or by the Fromm-Nieman corporation, pursuant to a joint undertaking of all four Fromm fur corporations. The primary purpose of this joint undertaking was to combat and control disease in the animal herds of these corporations. The expenses of such joint undertaking were offset, joint-venture-wise, against the income of the undertaking; and the resulting net deficit was, also joint-venture-wise, allocated among the members of the undertaking, in accordance with their prearranged method - in the instant *147 case, on the basis of the number of animals owned by each. The contemporaneous records of the Fromm fur corporations negative the existence of any intention on their part to contribute to petitioner any of the expenditures here involved. To the contrary, their records clearly reveal that they intended to, and did, retain the benefit of such expenditures for their own corporate purposes - by including same in their own books of account as current operating expenses, and by deducting the same on their income tax returns, in order to obtain for themselves substantial tax benefits. As regards the claimed additional "costs" of $1,107,701.10, these likewise were not paid or incurred by petitioner, and likewise were not contributed to petitioner by any of its stockholders. The items making up such further "costs" (which petitioner contends were contributed to it in the form of property and services) represent in part, the estimated costs to the Fromm fur corporations of foxes and minks in their herds, which are alleged to have died during the years 1933 through 1944 as the result of having been injected with serums and vaccines; and the remainder of such items represent the alleged costs *148 to said corporations of labor employed by them in making the injections. None of such animals belonged to petitioner; and none of such costs was ever entered in petitioner's books, from the time of its incorporation through the taxable years involved. Rather, all such costs were reflected on the books and in the income tax returns of the several Fromm fur corporations, either as current operating expenses, or as part of the costs of goods sold. Here again, the contemporaneous records negative any intention on the part of said corporations to treat these costs as a vehicle for investment in petitioner. Furthermore, we are convinced that substantially all of the items making up the above-mentioned claimed "costs" were not expenditures for the purpose of acquiring any capital asset. As regards the cash expenditures of $771,765.17, the purposes served by these, included: The development and the production of large quantities of serums and vaccines which were delivered to the Fromm fur corporations without any separate charge, for use in meeting their animal disease problems; the production of other amounts of serums and vaccines for sale to the public at a profit; the raising of large *149 numbers of foxes and minks belonging to two of the Fromm fur corporations - the pelts of which animals were sold by said corporations at a profit; and the performance of diagnostic services, both to the Fromm fur corporations without separate charge, and to other fur farmers for fees. And, as regards the items of property and services making up the claimed "costs" of $1,107,701.10, we are convinced that the Fromm fur corporations did not maintain their animal herds and cause the animals to be injected with serums and vaccines merely to provide petitioner with experimental specimens. Rather, these corporations ranked among the largest fur producers in the world; and we are satisfied that the expenses and losses which they incurred in preventing and combating disease among their fur-bearing animals, constituted the costs to them of medicines and quasi-veterinary services in the regular operation of their businesses. We are impressed by the fact that the Fromm fur corporations classified all these expenditures, currently and consistently over a long period of years, as operating expenses. The agents of the Internal Revenue Service, in their audits of the returns of these corporations, *150 made no adjustments with respect to such classification. And also, a nationally known accounting firm which audited the records of said corporations for the year 1942, likewise made no adjustment. We regard the evidence herein to be insufficient to establish that the contemporaneous judgments and actions of all these parties were erroneous. Finally, we deem it significant that none of the alleged cash costs was entered by petitioner in its books of account until the close of its fiscal year 1951 - which was long after the 1933-1944 period, when the expenditures are claimed by petitioner to have been contributed to it as "paid-in surplus." And we likewise deem it significant, that none of the alleged additional "costs" represented by property and services, was placed on petitioner's books at any time from its incorporation through the taxable years here involved. It is to be observed that the petitioner did, exactly 5 years earlier (on May 31, 1946), include its "patents" in its asset accounts, at a cost of only $10,587.91; and the allowance of depreciation deductions on these are not here in dispute. We hold, on the basis of our Findings of Fact and what we have said above, that *151 petitioner is not entitled to the additional deductions which it here claims; and we sustain the respondent's denial of the same. By reason of such action, it is unnecessary to consider respondent's alternative contentions, respecting estoppel. 2. The second issue is whether the petitioner, in computing its excess profits tax liabilities for the years 1951, 1952 and 1954, is entitled to include in its equity invested capital, "paid-in surplus" of $771,765.17. This claimed "paid-in surplus" is represented by the identical items which were claimed as cash "costs" of capital assets in Issue 1; and what we said there applies here also. We hold that no portion of said $771,765.17 was contributed to petitioner as paid-in surplus, at any time; and that petitioner had no paid-in surplus during any of the taxable years here involved. We decide this issue for the respondent. 3. The third issue is whether the petitioner, in computing its cost of goods sold for the year 1951, is entitled to use an opening inventory of $9,208.52 for biological products. Petitioner presented no evidence from its books and records, which either showed or tended to show: The amounts of such products which *152 it had on hand at the beginning of the year (the testimony establishes that the inventory figure claimed was based solely on estimate); either the cost or market value of any products which it may then have had on hand; or the time when it may have either produced or acquired any such products. Furthermore, the petitioner had not used an inventory of biological products in any prior year; it at no time either requested or obtained permission from the Commissioner of Internal Revenue to change its method of accounting or its method of reporting inventories; and it made no attempt to establish that, in setting up such new inventory, it had adjusted its purchase accounts for any prior year. We decide this issue in favor of the respondent. See Stanford R. Brookshire, 31 T.C. 1157, affirmed (C.A. 4) 273 F. 2d 638, certiorari denied 363 U.S. 827. Decisions will be entered for the respondent. Footnotes
1. The record contains no details as to the manner in which minks were raised. The cooperative handling of silver foxes started not later than the year 1930.↩
2. This is the amount which petitioner claimed in its pleadings and itemized in certain exhibits. Subsequently on brief, it contended that such "costs" were in the enlarged amount of $4,487,176.10, due to losses incurred by certain of its stockholders, through deterioration in the quality of their animals' pelts, caused by the use of serums and vaccines. Petitioner did not, however, amend its pleadings to claim such enlarged amount.↩